**UNITED STATES, Appellee,**

v.

**Cruz ROSARIO–PERALTA, a/k/a Crescencio Cedeño–Peralta, Defendant, Appellant.**

**United States, Appellee,**

v.

**Johnny David Diaz–Morla, Defendant, Appellant.**

**United States, Appellee,**

v.

**Ramon Antonio Javier, Defendant, Appellant.**

Nos. 97–2084 to 97–2086.

United States Court of Appeals, First Circuit.

Heard March 1, 1999.

Decided Dec. 23, 1999.

Jorge A. Toro McGowan for appellant Cruz Rosario–Peralta.

Benjamín Angueira–Aguirre for appellant Johnny Díaz–Morla.

Zygmunt G. Slominski, by appointment of Court, for appellant Ramón Antonio Javier.

Michelle Morales, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and Nelson Pérez–Sosa, Assistant United States Attorney, were on brief, for appellee.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and SELYA, Circuit Judge.

TORRUELLA, Chief Judge.

Defendants Cruz Rosario–Peralta, Johnny David Díaz–Morla, and Ramón Antonio Javier appeal their convictions and sentences for possession with intent to distribute cocaine while on the high seas. We addressed portions of these appeals in our previous decision, *United States v. Rosario–Peralta*, 175 F.3d 48 (1st Cir.1999). In that opinion, we rejected defendants' challenge to the sufficiency of the evidence, but we found ourselves unable to properly assess defendants' claims of discovery violations on the existing record. Thus, we retained jurisdiction of the case and remanded to the district court for the resolution of several discovery issues. On August 27, 1999, the district court issued its findings in response to our instructions. Having received supplemental briefing from the parties, we now resume our consideration of the remaining issues on appeal.

## BACKGROUND

We outlined the facts of this case at length in our previous decision, *see Rosario–Peralta*, 175 F.3d at 50–51, and we see no reason to repeat that entire account here. Nevertheless, a very brief review, focused on the facts relevant to today's decision, will set the factual context for our current discussion.

At approximately 1:11 a.m. on October 17, 1996, a United States Customs Service aircraft spotted a vessel heading towards Puerto Rico without any lights. After monitoring the suspect vessel for almost two hours, with the assistance of a United States Army National Guard helicopter, the government agents illuminated the suspect vessel and spotted its crew dumping bales, which later proved to contain cocaine, into the ocean. At trial, there was testimony, contested by defendants, that the helicopter remained over the suspect vessel and continued to illuminate it until it was intercepted. When a Customs vessel arrived on the scene and identified itself, defendants' vessel accelerated until the Customs vessel rammed it from astern. Defendants Rosario–Peralta and Javier then jumped into the water and refused to

allow the Customs crew to retrieve them for several minutes. Defendant Díaz–Morla sped away in the vessel and was caught by a Puerto Rico Police Department vessel. After waiving their rights and agreeing to speak to the agents, defendants gave conflicting and implausible statements about how they came to be traveling at sea early that morning. Later, a drug-sniffing canine detected narcotics contamination on defendants' vessel.

Following their convictions, appellants appealed, and we remanded to the district court for findings, as discussed above. We now consider those findings, as well as appellants' other arguments on appeal.

## DISCUSSION

**I. The District Court's Failure to Require the Government to Disclose Particular Communication Records and Logs**

**A. Our Prior Opinion and the District Court's Findings**

In our earlier opinion in this case, we found that the district court abused its discretion if it denied discovery of certain communication records and logs on the ground that they were irrelevant, when the district court had not reviewed the materials. *See Rosario–Peralta,* 175 F.3d at 55. We also recognized the possibility that the district court denied discovery of the logs based on the need for confidentiality, rather than because the logs were irrelevant, and we expressed reluctance to accept the government's stated concern for confidentiality as a basis for denying discovery of the logs. *See id.* at 57 n. 8. We observed that, because the district court denied discovery of the logs based on either relevance or the need for confidentiality, the district court did not determine whether the logs were required to be disclosed under Fed.R.Crim.P. 16(a)(1)(C), *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10

L.Ed.2d 215 (1963), or the Jencks Act, 18 U.S.C. § 3500. *See id.* at 56.

We then noted that, in an attempt to resolve the discovery issues on appeal, the government submitted a copy of what it claimed to be the only relevant log: the October 17, 1996 morning log of the United States Command Center Sector for United States Customs ("Sector"). *See Rosario–Peralta,* 175 F.3d at 56. We found it inappropriate to review the Sector log or to resolve the remaining discovery issues for the first time on appeal, so we remanded to the district court to perform both tasks. *See id.* We instructed the district court to review the Sector log, as well as any other potentially relevant logs, to determine: (1) whether the logs should have been disclosed under Rule 16, *Brady,* or the Jencks Act, and (2) if so, whether the government's failure to disclose the logs materially prejudiced the defense. *See id.* at 57.

On August 27, 1999, the district court responded with a four-page statement of its findings. The district court found that the logs at issue were: (1) the San Juan Sector Communication Master Station Log for October 17, 1996; (2) the log for an unnamed land-based agency code named "Razorback"; and (3) the log from the Drug Interdiction Operations Center (code named "Salty Dog").[1] The court reviewed these sets of logs and determined that they were required to be disclosed by Rule 16(a)(1)(C) and also as *Brady* material, but were not discoverable under the Jencks Act. Finally, the district court found that defendants were not prejudiced by the government's failure to disclose the logs, because the information to which defendants were entitled was made available to them through other means, namely, the reporting data and FLIR videotapes from Omaha 13, Omaha 85, and Hawk 514.

---

**1.** The Salty Dog log entries for October 17, 1996 were destroyed by lightning, but the pertinent information was transmitted to the

Domestic Air Interdiction Coordinating Center ("DAICC").

## B. Appellants' Renewed Claims of Discovery Violations

Although appellants agree with the district court's determination that the logs were discoverable under Rule 16(a)(1)(C) and also under *Brady,* they claim that the court erred in finding that all relevant information had been disclosed and that the defendants suffered no prejudice from the nonproduction. After careful consideration of the parties' supplemental briefs on this issue, we find no reversible error in the district court's ruling.

■ As a preliminary matter, we emphasize that the government's failure to produce discoverable materials in this case is a serious infraction which we do not condone. There is no dispute that the prosecution had access to these logs before and during trial. The sole basis offered by the United States for resisting disclosure is the desire to maintain the secrecy of the logs' code names, an objective that could have been easily and effectively achieved through redaction without depriving the appellants of information to which they were entitled under the Rules of Criminal Procedure and federal case law. Mindful of the government's error, we will proceed to consider appellants' claims of error by the district court.

■ Appellants' first contention—that the district court could not know whether all relevant information was disclosed to them through other means—is their strongest. The government's response— that appellants fail to "pinpoint" any information that was not disclosed—is clearly inadequate; appellants' very point is that they do not and cannot know what exculpatory information may have been on the logs, and yet the government expects them to identify particular pieces of information to which the government improperly denied them access. Given the accidental destruction of the Salty Dog log requested by the defense, we are inclined to agree with the appellants that the district court was in a poor position to determine with absolute certainty whether that log contained any discoverable information that was not in fact produced in another form. However, we do not require "absolute certainty" to support a trial court's determinations on the discoverability of information under the federal rules nor under *Brady.* The district court's findings were made with the benefit of written and oral argument from both sides and after the government produced to the appellants and to the court all existing materials that could reasonably have been expected to contain discoverable information relevant to the motion to compel. Because the appellants have done little more than speculate as to what other information the logs might have contained, we simply cannot hold that the district court abused its discretion in finding that all discoverable information had in fact been produced to the defendants by other means.

Whatever our nagging doubts regarding the completeness of the information produced to appellants by other means, we are in complete agreement with the district court that appellants were not prejudiced by the failure to produce the logs. The record amply demonstrates that appellants were not impeded in the presentation of their defense, and the substantial other evidence presented at trial was such that the mere possibility of additional exculpatory evidence in the logs is insufficient to call into doubt the fairness of appellants' trial or the verdict reached by the jury.

To succeed on their Rule 16 claim, appellants would have to demonstrate prejudice resulting from the government's nondisclosure. *See United States v. Spinosa,* 982 F.2d 620, 630–31 (1st Cir.1992). Under *Brady,* they must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Gilday v. Callahan,* 59 F.3d 257, 267 (1st Cir.1995) (internal quotations omitted). Under either standard, the appellants have fallen well short of the mark. Although

we are sympathetic to the difficulty of demonstrating how information might have aided one's case without ever seeing that information (or even knowing that it exists), some showing, albeit imperfect, must be made before an appellate court can reverse the reasoned decision of the trial court, and appellants have offered us nothing of any substance upon which to hang our proverbial hats. Because the appellants have not demonstrated prejudice from the government's failure to disclose the logs, and in light of the substantial evidence supporting the jury's guilty verdict, we affirm the district court's ruling.[2]

## II. The District Court's Interference With the Testimony of Defendants' Expert

Defendants next argue that the testimony of their expert, Captain Edwin Geary, was rendered ineffective because the district court interfered with his testimony. Defendants complain that the court: (1) interrupted and clouded Captain Geary's significant findings; (2) questioned his calculations; (3) questioned his testimony regarding hull speed; (4) confused the issues by interrupting his testimony; (5) attempted to bolster or rehabilitate the previous testimony of government witnesses; (6) emphasized points helpful to the prosecution; (7) attacked Captain Geary's credibility; and (8) communicated to the jury that it did not believe the witness. Defendants complain that the court's interference rose to the level of advocacy and denied them a fair trial by communicating to the jury that the court had taken a side.

■ The government responds that the district court merely attempted to clarify vague and confusing testimony for its own benefit and the benefit of the jury. We have stated previously that the trial judge is more than a "mere moderator" in a federal trial and that the trial judge has the prerogative of eliciting facts he deems

necessary to the clear presentation of issues. *See United States v. Paz Uribe*, 891 F.2d 396, 400 (1st Cir.1989). Thus, the judge "may examine witnesses who testify, so long as he preserves an attitude of impartiality and guards against giving the jury an impression that the court believes the defendant is guilty." *Id.* at 400–01 (quoting *Llach v. United States*, 739 F.2d 1322, 1329–30 (8th Cir.1984)). In *Paz Uribe*, we found that testimony presented by the defendant was confusing and that the district court acted appropriately in attempting to clarify the testimony. *See id.* at 401.

■ Similarly, we find here that the district court appropriately questioned the defense expert, while managing to preserve an attitude of impartiality. Captain Geary's testimony was confusing in that it included numerous maritime calculations. The district court did interrupt several times to ask questions, but the court also did so during the testimony of government witnesses regarding the same subject matter. The court asked short, even-handed clarifying questions, albeit frequent ones, and refrained from making any communications to the jury about Captain Geary's credibility or calculations. Nor did the district court abandon its impartiality by rehabilitating the previous testimony of government witnesses or emphasizing points helpful to the prosecution, to the extent that it actually engaged in either activity. While, in asking its clarifying questions, the district court may have raised issues that defendants would rather the jury not focus on, it cannot be said that the district court did so to benefit the government. All issues raised in the district court's questions were raised impartially and for the benefit of clarity alone. Thus, although trial judges are to be given the "widest possible latitude" in making judgments about the need to clarify testimony, *Rodriguez v. Banco Central Corp.*,

---

**2.** Because we affirm the finding that no prejudice resulted from the failure to produce the logs, we need not reach appellants' further claim that the district court erred in ruling that the logs were not discoverable under the Jencks Act.

990 F.2d 7, 12 (1st Cir.1993), we would reject defendants' arguments here even if we were not required to grant such latitude.

## III. Evidence of Positive Canine Alert to Narcotics Contamination

Defendants also object to the testimony elicited at trial about the positive canine alert to narcotics contamination that was given by Gator, a Puerto Rico Police canine, on board defendants' vessel. Defendants argue that: (1) the unreliable "dog sniff" evidence should have been excluded under Federal Rule of Evidence 403 because its probative value was substantially outweighed by the danger of unfair prejudice, and (2) the court should have allowed defendants' counsel to voir dire the canine's handler, Agent Rafael Ocasio–Cruz, outside the presence of the jury.

### A. Federal Rule of Evidence 403

■ We begin by noting that defendants have a difficult hill to climb. We review a trial court's Rule 403 balancing for an abuse of discretion, and only in "extraordinarily compelling circumstances" will we reverse the district court's judgment concerning the probative value and unfair effect of the proffered evidence. *See United States v. Gilbert*, 181 F.3d 152, 160–61 (1st Cir.1999) (citing *United States v. Shea*, 159 F.3d 37, 40 (1st Cir.1998)).

■ In arguing that dog sniff evidence has little probative value, defendants cite *United States v. Carr*, 25 F.3d 1194 (3d Cir.1994), for Judge Becker's concurring and dissenting opinion that assails the reliability of dog sniff testimony in the context of currency. In that opinion, Judge Becker cites to numerous studies and evidence that persuaded him that "a substantial portion of United States currency now in circulation is tainted with sufficient traces

of controlled substances to cause a trained canine to alert to their presence." *Id.* at 1215. We express no opinion today regarding Judge Becker's view that a positive canine alert to a particular bundle of currency has little probative value because of the substantial amount of all currency that has been tainted by illegal drugs.[3] Nevertheless, Judge Becker's discussion is irrelevant to our analysis here. The present case does not involve a dog sniff of currency, which can easily and quickly travel through several sets of unknown hands. Rather, our case involves a dog sniff of defendants' vessel. Judge Becker's analysis might have had some bearing on the present case if defendants had offered similar studies indicating that the circulation of nautical vessels is sufficiently similar to the circulation of currency that a substantial portion of vessels are also tainted with traces of controlled substances. Because defendants did not—and perhaps cannot—show such similarity, the concern raised by Judge Becker does not undermine the reliability of the evidence presented.

Even so, defendants attempt to demonstrate that the dog sniff evidence presented below was unreliable, and therefore lacking in probative value, by listing facts elicited from Agent Ocasio–Cruz on cross-examination. Defendants claim that it was established during Agent Ocasio–Cruz's cross-examination that canines do not alert properly when they are sick. However, what Agent Ocasio–Cruz actually testified to was that Gator "act[s] differently" when he is sick. Defendants also claim that it was established that canines cannot identify the substance for which they are alerting, but the actual testimony was that the canines give the same signal for each of four types of illegal narcotics. Defendants correctly characterize Agent Ocasio–Cruz's testimony that: (1) the canine cannot de-

**3.** We have addressed the issue raised by Judge Becker in at least one previous case. In *United States v. Saccoccia*, 58 F.3d 754, 777 (1st Cir.1995), *cert. denied*, 517 U.S. 1105, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996), we held that the district court did not abuse its discretion in admitting canine sniff evidence, despite defense expert testimony regarding the widespread contamination of circulating currency.

termine the time at which the contamination of the surface occurred; (2) the canine gives different signals for alerts to specific and general areas; and (3) the trainer must interpret the signal from the canine. Agent Ocasio–Cruz also testified that: (1) no drugs were found on the vessel; (2) his report indicated a "possible presence of contamination of controlled substance"; and (3) Gator only scratched on the top of a small fiberglass box on the deck of the vessel. From this last fact, defendants argue that Gator alerted to a small area (the fiberglass box) that could not have held the large amount of narcotics involved in this case.

Some of the facts elicited by defendants do demonstrate that dog sniff testimony is not a perfect indicator of a particular controlled substance in a particular, well-defined location at a particular time. After all, it is at least possible that Gator alerted to the presence of a different controlled substance than the cocaine found to have been dumped in the ocean that day. Also, it is possible that Gator alerted to a contamination that occurred well before the bales of cocaine were alleged to have been aboard. And, due to Gator's less-than-perfect communicative abilities, it is possible that Gator alerted to an area that was not precisely identified by his handler.

However, these facts do not substantially diminish the probative value of this testimony. Agent Ocasio–Cruz testified that Gator gave a positive alert to the presence of a controlled substance on the deck of defendants' vessel. Despite defendants' attempts to demonstrate the contrary, Agent Ocasio–Cruz specifically testified that Gator alerted to a contaminated area that was larger than merely the fiberglass container. While this testimony is not perfect, it is extremely probative in a case in which defendants claim that they were never in possession of the cocaine. No narcotics were found on the vessel, so the only way the government could link the cocaine to defendants was by demonstrating that defendants' vessel was the vessel

that dumped the bales of cocaine into the ocean when spotted by the National Guard helicopter. Defendants contested the officers' claims that they saw defendants' vessel do the dumping, but the positive canine alert corroborated the officers' testimony by demonstrating that an allegedly unbiased canine indicated that a controlled substance contaminated defendants' vessel. Thus, the dog sniff testimony had substantial probative value.

█ Defendants offer little argument regarding the opposite side of the Rule 403 equation: unfair prejudice, confusion of the issues, or the potential for misleading the jury. Defendants argue that allowing this testimony enhanced the credibility of government witnesses who claimed that defendants' vessel was the vessel they saw dumping bales of cocaine, but defendants do not explain why this was improper or unfair. The admission of the dog sniff testimony to corroborate the officers' testimony was undoubtedly detrimental to defendants' defense, but that does not mean that it is "unfair[ly] prejudic[ial]" under Rule 403. See United States v. Munoz, 36 F.3d 1229, 1233 (1st Cir.1994) ("The damage done to the defense is not a basis for exclusion; the question under Rule 403 is one of 'unfair' prejudice—not of prejudice alone.") (quoting United States v. Moreno Morales, 815 F.2d 725, 740 (1st Cir.1987)). "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). " 'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." Id. (quoting Advisory Committee's Notes on Fed. Rule Evid. 403, 28 U.S.C.App., p. 860). Defendants fail to raise or explain the possibility of any such unfair prejudice. Accordingly, defendants' Rule 403 argument fails.

## B. Refusal to Allow Voir Dire of Agent Ocasio–Cruz

In the conclusion to the section of their brief arguing that the district court erred in admitting the dog sniff testimony, defendants baldly assert that the court also abused its discretion by not permitting defendants to voir dire Agent Ocasio–Cruz outside the presence of the jury. Nowhere in their brief do defendants offer any argument or authority to demonstrate why it was error to fail to allow voir dire outside the jury's presence. When asked about this contention at oral argument, defendants' counsel responded that: (1) the testimony was prejudicial, and (2) there was no reason for the jury to hear arguments of whether the testimony was substantially more prejudicial than probative. We have already held that this testimony was not so prejudicial as to require its exclusion under Rule 403, so we see no harm in allowing the testimony to be heard before defense counsel could voir dire Agent Ocasio–Cruz during cross-examination.

As for counsel's argument that the jury should not have been exposed to arguments regarding the prejudice and probative value of Agent Ocasio–Cruz's testimony, we find no instance in which this occurred. The discussion of defendants' motion to exclude this testimony took place at a sidebar bench conference. Defense counsel certainly attempted to undermine the value of this testimony during cross-examination of Agent Ocasio–Cruz, but these efforts at vigorous cross-examination were obviously appropriate for the jury to hear. Because we find that the testimony was properly admitted, and because we find that the jury was not subjected to inappropriate argument, we reject defendants' argument that the district court should have allowed them to voir dire Agent Ocasio–Cruz outside the presence of the jury.

## IV. Admission of Defendants' Post–Arrest Statements

Defendants next argue that the district court erred in admitting evidence of statements given by all three defendants during their post-arrest interrogation. Defendants argue that the admission was improper for two reasons.[4] First, defendants claim that the statements were not voluntary, despite defendants' signed waivers of their rights. Second, defendants contend that the prejudicial effect of the statements substantially outweighed their probative value under Rule 403. We address the latter argument first.

### A. Federal Rule of Evidence 403

Defendants argue that the relevancy of their statements is far outweighed by the prejudicial effect of allowing the jury to speculate and draw inferences of guilt. Again, we believe that defendants confuse harmfulness to their case with unfair prejudice. There is nothing improper about a jury drawing inferences about the guilt of three defendants who gave inconsistent and incredible statements about how they acquired their vessel and where they were going.

Further, these statements and the inconsistencies between them were probative of the offenses with which defendants were

---

4. Defendants also offer a third argument regarding their statements: that the court erroneously admitted the statements of each codefendant as evidence against the other two. However, defendants neither develop this argument any further nor provide any authority for the proposition that it was in fact error to do so. "We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation." *United States v. Bongiorno,* 106 F.3d 1027, 1034 (1st Cir.1997). "An issue lacks developed argumentation if the appellant merely mentions it as a 'possible argument in the most skeletal way, leaving the court to do counsel's work.' " *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n,* 142 F.3d 26, 43 (1st Cir.1998) (quoting *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990)). Accordingly, we deem this argument to be waived.

charged. Defendants were charged with possession with intent to distribute cocaine while on the high seas. Therefore, the purpose of defendants' early morning ocean voyage was quite relevant. All three defendants claimed that they were going fishing, but their testimony was inconsistent as to the location in which they planned to do so. None of the three defendants claimed to know who owned the vessel that they were using or how they happened to obtain the keys to the vessel. The inconsistencies in defendants' statements and the implausibility of their claims of ignorance regarding the origins of the vessel tended to show that their fishing explanation was untrue. If defendants lied about why they were in the vicinity of the area in which the agents saw bales of cocaine being thrown into the water, those lies could properly be seen by a jury as an attempt by defendants to conceal their crime. Thus, defendants' statements were relevant. Consequently, we reject defendants' Rule 403 argument in this context as well.

### B. Voluntariness of Defendants' Statements

■ Defendants argue that their statements should have been excluded because they were not made voluntarily. Although the ultimate issue of the voluntariness of a confession is a question of law subject to plenary review, we will accept the district court's subsidiary findings of fact unless they are clearly erroneous. *See United States v. Burns*, 15 F.3d 211, 216 (1st Cir.1994) (citing *United States v. Garcia*, 983 F.2d 1160, 1167 (1st Cir.1993)).

The district court rejected defendants' voluntariness arguments in denying their motion to suppress. The court appeared to accept the facts that the defendants may have been wet, the air conditioning may have been on in the office, and the defendants may have been hungry. Nevertheless, the court accepted Agent Vicéns' testimony that: (1) it was calm in the room; (2) no one was making any threats or forcing defendants to speak; (3) there were no loud voices or indications of violence; (4) each defendant was advised that he was being arrested for smuggling; (5) Agent Vicéns asked each defendant if he knew how to read and write; (6) each defendant read the rights being waived or appeared to do so without indicating that he could not read or write; (7) agents slowly and carefully explained to each defendant in Spanish the rights being waived; and (8) the defendants were asked after every explanatory sentence if they understood their rights. The court deemed this sufficient to find that the waiver of rights was voluntarily and knowingly made and therefore that the statements were voluntarily made.

■ Defendants' entire argument on appeal that the statements were involuntary consists of the following: (1) defendant Javier was dressed in shorts and was without a shirt; (2) Javier was interrogated in the Customs office after paddling around for several minutes in rough waters after the collision; (3) Javier was never asked if he could read or write; and (4) Agents Vicéns and López each signed defendants' waivers indicating that they witnessed more than one waiver of rights at 5:00 a.m., even though the three defendants were in separate cubicles.

Only one of these contentions alleges a fact that is at odds with the district court's findings. On the day after the court's ruling, Agent Vicéns testified that he did not ask Javier whether he could read and write. Even if we were to find that this post-ruling evidence renders erroneous the court's finding that all defendants were asked that question, we would not—and do not—disagree with the district court's ultimate finding that the waiver and statements were given voluntarily. The defendants were placed under arrest at approximately 3:30 a.m. and did not sign their waivers or give their statements until 5:00 a.m. Therefore, we place little emphasis on the effect of the collision on the defendants at the time they made

their statements approximately ninety minutes later. Defendants do not challenge the district court's findings regarding the calmness of the room, the explanation of defendants' rights, or the steps taken to ensure that defendants understood those rights, and we agree with each of those findings. After conducting plenary review of this issue, we find that defendants knowingly and voluntarily waived their rights and voluntarily gave the statements that were admitted at trial. Accordingly, the district court did not err in admitting those statements at trial.

## V. Admission of Evidence of the Street Value of the Cocaine

■ Defendants complain that Agent Waldo Santiago was permitted to testify to the "overestimated" street value of the recovered cocaine: one billion dollars. Defendants contend that the sole purpose of this testimony was to frighten the jury, infuse emotional bias, and improperly instill the desire to convict. Defendants argue that the relevancy of this evidence is low, because the intent to distribute could have been amply demonstrated through testimony that defendants were seen throwing bundles from the vessel.

Citing *United States v. Rivera*, 68 F.3d 5 (1st Cir.1995), *cert. denied*, 516 U.S. 1139, 116 S.Ct. 970, 133 L.Ed.2d 891 (1996), and similar cases from other circuits, the government counters that such evidence of street pricing is "routinely" admitted by courts in order to prove the intent to distribute. What this argument ignores, however, is that such evidence could conceivably become substantially more prejudicial than probative if the figure is large enough and if other evidence to prove intent to distribute is available.

We have little trouble accepting defendants' view that the introduction of the one-billion-dollar street value was prejudicial. Whether that prejudice is unfair or not is a close question. The enormity of that figure could well evoke exactly the type of fear and emotional response that

Rule 403 seeks to avoid, but that ability to frighten is only present because defendants chose to smuggle such a substantial amount of cocaine. It seems to us at least awkward for defendants to argue that it was unfairly prejudicial to shock the jury by informing them of the magnitude of the offense. However, while much of the shock value comes from the magnitude of the offense, the spin the government attempts to put on the offense by attaching the mammoth street value price tag certainly adds (perhaps unnecessarily) to that shock value.

In all events, evidence of the street value of controlled substances is a widely accepted method of proving the intent to distribute. *See, e.g., Rivera*, 68 F.3d at 8 ("There is little dispute that such information may aid in proving intent to distribute."); *United States v. Amaechi*, 991 F.2d 374, 377 (7th Cir.1993); *United States v. Pigrum*, 922 F.2d 249, 254 (5th Cir.1991). While the district court could have required the government to prove intent to distribute in another way, it had discretion to admit the evidence that it did. The district court balanced the components of Rule 403 and found that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. We cannot say that the district court's decision fell outside the boundaries of its considerable discretion. Simply put, this is not one of those sets of "extraordinarily compelling circumstances" in which we would upset the balance struck by the district court. *See Gilbert*, 181 F.3d at 160–61.

## VI. Impartiality of the District Court's Instruction to the Jury at the End of the Fifth Day of Trial

■ Defendants claim that the district court's May 16, 1997 instruction advising the jury not to discuss the case communicated to the jury the court's belief that defendants were guilty. Defendants complain that the implication of the instruction was that defendants were "dealing with

drugs" and were "caught off Fajardo." Recognizing that they failed to object to the instruction when it was given to the jury, defendants complain that this instruction rose to the level of plain error. *See* Fed.R.Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *see also United States v. Paniagua–Ramos,* 135 F.3d 193, 197 (1st Cir.1998) (subjecting the defendants' complaints regarding an *Allen* instruction to plain error analysis under Rule 52(b) because they failed to object in a timely fashion). The government does not respond to this argument.

We first dispose of defendants' claim that the court implied that defendants were "dealing with drugs." What the district court actually stated was that the jurors were allowed to tell others only that they were jurors on a "case in federal court dealing with drugs." Thus, the court stated quite accurately and impartially that the case dealt with drugs, not that the defendants did.

The second quotation offered by defendants raises more of a concern, but only slightly. The court also told the jurors that they could tell others that the defendants "were caught off Fajardo or in the general area of the east." We understand how defendants could object to the use of the word "caught," which carries with it the connotation that the individuals who were "caught" were guilty. It would have been preferable for the district court to have said that the jury could tell others: (1) that the case was a drug case dealing with individuals who were "arrested" near Fajardo, or (2) that the case was a drug case in which the drugs were recovered near Fajardo. However, we are reluctant to require the district court to engage in such semantic hair-splitting, especially in the absence of a contemporaneous objection. We do not agree that the district court's perhaps imprecise choice of words communicated to the jury a belief that the defendants were guilty. Therefore, we do

not find that the district court committed any error in this regard, let alone the "obvious" error affecting substantial rights that is required by the plain error standard. *See United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

## VII. The District Court's Refusal to Give an Instruction on Defendants' Theory of the Case

■ Defendants next argue that the district court erred in refusing to give their proposed instruction regarding their theory of defense. At the conclusion of trial, defendants submitted the following "Special Charge on Theories of Defense":

Also, as it relates to the facts and evidence in this case, the government must specifically prove, beyond a reasonable doubt, that thirty-one (31) bales were thrown overboard from a vessel approximately 18 to 20 nautical miles N.E. of Cabo San Juan, (Fajardo Light House) between the hours of 2:57 a.m. and 3:03 a.m., on October 17, 1996, which bales were later retrieved and found to contain a controlled substance, to wit: cocaine.

The government must also prove, beyond a reasonable doubt, that the 31 bales it claims were thrown out or dumped from the vessel it had been tracking, at approximately 2:57 a.m. and 3:03 a.m., on October 17, 1996, came from the same boat and vessel which was rammed and stopped at approximately 3:30 a.m., on October 17, 1996, approximately one and one half (1 1/2) miles off of Cabo San Juan, (Fajardo Light House) and upon which the defendants were found and arrested.

Thus, in addition to having to prove, beyond a reasonable doubt, each and every one of the elements of the offense, as charged, the government must also prove, beyond a reasonable doubt, that the vessel which dumped the bales between the hours of 2:57 a.m. and 3:03 a.m., was the same vessel upon which

the defendants were found when it was rammed at approximately 3:30 a.m., approximately one and a half (1–1/2) miles off of Cabo San Juan, (Fajardo Light House).

If you find that the government cannot prove, beyond a reasonable doubt, that the vessel which was tracked from approximately 1:11 a.m. until 3:03 a.m. was the same vessel as the one upon which the defendants were found when rammed at approximately 3:30 a.m., then you must find them not guilty and acquit each one of them of the offense and charge brought against them.

Further, if you find that the government cannot prove, beyond a reasonable doubt, that the vessel upon which the defendants were found [ ] could have attained and sustained the average speed required for it to have traveled from the approximate point where the bales were reportedly dropped to the approximate point where the defendant's vessel was rammed, then you must find them not guilty and acquit each one of them of the offense and charge brought against them.

The district court refused to give the proposed instruction because it was "replete with the evidence on the record." The district court stated several times that it was not proper for the court to comment on the evidence and that it would necessarily be doing so if it gave the proposed instruction.

■ We disagree, in part. We have repeatedly stated that "the trial judge is not limited to instructions in the abstract. The judge may explain, comment upon and incorporate the evidence into the instructions in order to assist the jury to understand it in light of the applicable legal principles." *United States v. Maguire*, 918 F.2d 254, 268 (1st Cir.1990) (citing *Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933)); *see also United States v. Burke*, 948 F.2d 23, 28 (1st Cir.1991). There are limitations placed on the trial judge's comments to

prevent the judge from assuming the role of a witness, misleading the jury, or distorting or adding to the evidence. *See Maguire*, 918 F.2d at 268–69 (quoting *Quercia*, 289 U.S. at 470, 53 S.Ct. 698). Beyond that, however, the trial judge may exercise her discretion in how best to assist the jury. On this basis, the district court likely could have given the detailed, case-specific instruction that the defendants requested, or otherwise simplified the somewhat prolix and repetitive history of facts critical to identifying defendants' vessel as the culprit. *See Leshore v. County of Worcester*, 945 F.2d 471, 474 (1st Cir.1991); *Maguire*, 918 F.2d at 268.

■ Nevertheless, our determination that the proposed instruction was not necessarily improper does not mean that the district court was required to give the instruction to the jury. A defendant is entitled to an instruction on his theory of defense if sufficient evidence is produced at trial to support the defense and the proposed instruction correctly describes the applicable law. *See United States v. Montanez*, 105 F.3d 36, 39 (1st Cir.1997) (citing *United States v. McGill*, 953 F.2d 10, 12 (1st Cir.1992)). However, the defendant is not entitled to a verbatim reading of the requested instruction, and the court need not instruct on every particular that conceivably might be of interest to the jury. *See Montanez*, 105 F.3d at 39. Therefore, a trial court's failure to deliver a theory of defense instruction will result in reversal only if: (1) the requested instruction correctly describes the applicable law; (2) sufficient evidence is produced at trial to warrant the instruction; (3) the charge actually delivered does not fairly present the defense; and (4) the requested instruction was essential to the effective presentation of the particular defense. *See id.* (citing *United States v. Passos–Paternina*, 918 F.2d 979, 984 (1st Cir. 1990)).

Defendants appear to satisfy the first two elements. At bottom, defendants' the-

ory of defense instruction, stripped of its details, charges that the government must prove beyond a reasonable doubt that defendants' vessel was the same vessel that government agents tracked and witnessed dumping the thirty-one bales of cocaine. Because the government had to prove that the defendants possessed the thirty-one bales of cocaine on the high seas, this is essentially a correct statement of the government's burden in this case. And, although confusing, defendants did present evidence that their vessel could not have been the vessel tracked by the government agents between 1:11 a.m. and 2:50 a.m., due to the sea conditions and the maximum sustainable speed of defendants' vessel.

Where defendants stumble is in the third and fourth elements of the standard. The instruction delivered to the jury does fairly present defendants' "wrong boat" defense, and the proposed instruction was not essential to the effective presentation of that defense. The district court instructed the jury that the government had to prove that the defendants knowingly and intentionally possessed the cocaine with the intent to distribute it. The district court instructed the jury at length regarding the definition of possession and what the jury needed to find to render a guilty verdict. These instructions adequately covered the substance of the proposed instruction: that the government must prove that it was defendants, and not the crew of some other nearby vessel, that possessed the bales of cocaine. Because the district court's instructions adequately covered defendants' theory of defense, there was no error in declining to give their proposed instruction. *See McGill,* 953 F.2d at 13.

Additionally, defendants were able to effectively present their "wrong boat" defense. This was the clear theme of the defense put on by defendants, as evidenced by its extensive coverage at closing argument. The district court's instructions opened the door for the jury to give life to defendants' theme. The fact that the jury chose not to subscribe to this theory of the case does not mean that defendants were precluded from effectively presenting it. Accordingly, we reject defendants' challenge to the district court's instructions.

## VIII. Sentencing

■ Defendants raise several arguments protesting their sentences, although many of them take the form of generalized complaints that are not tied to any particular sentencing calculation. We review the district court's findings of fact during sentencing for clear error, *see United States v. Aker,* 181 F.3d 167, 171 (1st Cir.1999), and we review its determinations of law under the Sentencing Guidelines *de novo. See United States v. Ticchiarelli,* 171 F.3d 24, 35 (1st Cir.1999).

### A. District Court's Remarks Regarding Conspiracy

■ Defendants first argue that the court erroneously believed that this was a conspiracy case. They point to the court's statement that "all three of them participated in this conspiracy to import 1,040 kilograms of cocaine." Defendants do not, however, explain how this alleged error affected their sentences. They do not argue that the district court used the wrong sentencing guideline in calculating their base offense level. Nor do they argue that this alleged erroneous belief caused the district court to apply any improper enhancements or to deny any appropriate reductions. After reviewing the entire sentencing record, it is clear to us that the district court engaged in the proper analysis and merely spoke colloquially when it referred a single time to the "conspiracy to import". Thus, we reject defendants' contentions that the court erroneously treated this as a conspiracy case.

### B. Undue Influence

Defendants also argue that the district court was unduly influenced by two factors: (1) the amount of cocaine involved

and (2) deterrence of other potential offenders. Again, defendants do not explain why the district court erred by considering these two factors or how this alleged error actually impacted their sentences.

 The amount of the controlled substance is not only a relevant concern at sentencing, it is the most critical factor used to determine the proper base offense level. *See* U.S.S.G. § 2D1.1(c) (Drug Quantity Table). Accordingly, the court clearly did not err in considering this factor. To the extent that defendants argue that the district court was influenced by the amount of the controlled substance to sentence them at the upper end of the guidelines range, we offer two responses. First, we have no appellate jurisdiction to review a sentence within the applicable sentencing guidelines range if that range was correctly determined. *See United States v. Panet–Collazo*, 960 F.2d 256, 261 (1st Cir.1992). Second, even if we did, we would find nothing wrong with imposing a high-end sentence based on this factor. The highest base offense level under § 2D1.1 for a violation of 46 U.S.C.App. § 1903(a) in which no death or serious bodily injury occurred is Level 38, the level attributed to defendants. This level is achieved by possessing 150 kilograms of cocaine, and defendants possessed almost seven times that amount. There is nothing improper about a district court considering a sentence at the upper end of the sentencing range for an offense involving a substantially greater quantity of cocaine than that involved in the standard offense meriting a base offense level of 38.

 Our conclusions do not differ with regard to the district court's stated concerns regarding deterrence. Defendants do not argue that the court's deterrence concerns caused it to err in determining the proper sentencing range. Rather, defendants merely argue that the court's comments regarding deterrence "reflect an unfounded instinct for harsher punishment." To the extent that this is an argument that the court's deterrence concerns

resulted in a high-end sentence, we again lack jurisdiction, *see Panet–Collazo*, 960 F.2d at 261, and we again fail to share defendants' outrage over the use of this factor. In fact, 18 U.S.C. § 3553(a)(2)(B) expressly directs the district court to consider the need for adequate deterrence when imposing a sentence. For these reasons, defendants' claims of undue influence fail.

### C. Escape

 Defendants next argue that the district court erred in finding that they attempted to flee the scene when they were apprehended. Yet again, defendants fail to explain to the Court how they were harmed by this alleged error. In any event, the district court's finding was not clearly erroneous. The court heard testimony that: (1) the crew of the Customs vessel pursuing defendants' vessel identified themselves as police officers; (2) defendants' vessel stopped and then accelerated; (3) Rosario–Peralta and Javier jumped into the water when the Customs vessel rammed their boat; (4) Rosario–Peralta and Javier attempted to swim away and remained in the water to avoid boarding the Customs vessel; (5) Díaz–Morla sped away when the Customs vessel stopped to retrieve Rosario–Peralta and Javier; and (6) Díaz–Morla initially failed to heed orders to stop and eventually stopped only when agents threatened to neutralize the vessel's engines.

Rosario–Peralta and Javier claim that it is unreasonable to conclude that they were trying to escape, given that they went overboard a mile and a half offshore. While it may in fact have been unreasonable for Rosario–Peralta and Javier to think that their escape attempt would be successful under those circumstances, the district court's finding that escape was on their minds is still the most reasonable interpretation of the events. Díaz–Morla claims that he was not trying to escape either; he was merely maneuvering the vessel in response to the collision caused

by the Customs vessel. Given the testimony to the contrary, this argument is equally unsuccessful in demonstrating clear error in the district court's finding of attempts to escape.

### D. Acceptance of Responsibility

██ Each defendant claims that the court erroneously denied him a two-level downward adjustment under U.S.S.G. § 3E1.1(a) for acceptance of responsibility. This adjustment is applicable when "the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). The district court's decision to withhold a reduction in the offense level will not be overturned unless clearly erroneous. *See United States v. Gonzales,* 12 F.3d 298, 300 (1st Cir.1993). The burden is on the defendant to demonstrate that he or she should have received the reduction. *See United States v. Uricoechea–Casallas,* 946 F.2d 162, 167 (1st Cir.1991).

██ Defendants greatly diminished their chances for receiving this adjustment by pleading not guilty and proceeding to trial. *See* U.S.S.G. § 3E1.1, Application Note 2 ("This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."). However, there are "rare situations" in which a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial. *Id.*

Neither Rosario–Peralta nor Díaz–Morla presents this Court with such a "rare situation" because, even now on appeal, they maintain their factual innocence. Thus, they are not entitled to a downward adjustment for acceptance of responsibility. *See United States v. Dodd,* 111 F.3d 867, 870 (1st Cir.1997) (affirming the district court's denial of a reduction for acceptance of responsibility based on the defendant's "continued denial of factual guilt"); *United States v. Perez–Perez,* 72 F.3d 224, 228 (1st Cir.1995) (finding no error in the district court's denial of a § 3E1.1(a) adjustment when the defendant declared his innocence at sentencing).

██ Defendants object to this result, claiming that they cannot be punished for preserving their constitutional right to appeal by maintaining their innocence. We join the circuits that have rejected this claim and found that § 3E1.1 does not prejudice or penalize a defendant for exercising his right to appeal. *See, e.g., United States v. Davis,* 960 F.2d 820, 829 (9th Cir.1992); *United States v. McDonald,* 935 F.2d 1212, 1222 (11th Cir.1991); *United States v. Monsour,* 893 F.2d 126, 129 (6th Cir.1990). Although we have not previously addressed the precise issue raised by defendants, our decisions on closely related questions have recognized the principles underlying the decisions of our sister circuits on this issue. For instance, in *United States v. Munoz,* 36 F.3d 1229, 1236–37 (1st Cir.1994), we rejected the appellant's argument that his constitutional right to trial was infringed when the district court refused to grant him a § 3E1.1 reduction because he had proceeded to trial rather than plead guilty. While recognizing the difficult choice presented to a criminal defendant, we stated that "not every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right, is invalid." *Id.* (quoting *Corbitt v. New Jersey,* 439 U.S. 212, 218, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978)). In *United States v. Paz Uribe,* 891 F.2d 396, 400 (1st Cir.1989), we upheld the constitutionality of § 3E1.1 against a challenge brought under the Fifth Amendment, stating that the Sentencing Guidelines "merely codify a tradition of leniency and are not an impermissible burden on the exercise of constitutional rights."

Furthermore, as noted by the Sixth Circuit in *Monsour,* this is not a case in which a defendant's punishment has been increased for failure to accept responsibility.

*See id.* Instead, defendants who choose to demonstrate remorse are granted special leniency. The fact that § 3E1.1 forces defendants to make a difficult choice simply does not violate their constitutional rights to trial or to an appeal. *See Munoz,* 36 F.3d at 1236–37; *Davis,* 960 F.2d at 829. Thus, we reject defendants' arguments in this regard.

 Defendant Javier raises a somewhat different argument. He claims that he did in fact express remorse and accept responsibility for his conduct when he stated, "I feel very bad about the position I am in and I wish you would consider me." [5] However, Javier made no mention of the crime in this short statement and did not express regret over any actions he has taken. Rather, he appeared to express displeasure with the consequences of being convicted of the crime. As such, Javier's statement falls far short of "clearly demonstrat[ing] an acceptance of responsibility for his criminal conduct." U.S.S.G. § 3E1.1, Application Note 2.

Perhaps recognizing this, Javier claims that the district court "cut him off" before he could finish. Citing *United States v. De Alba Pagan,* 33 F.3d 125 (1st Cir.1994), Javier complains that the district court thereby denied him his right to allocution. In doing so, Javier misrepresents the situation as it occurred during the sentencing hearing. When the district court asked both Javier and his counsel if they wished to make any factual corrections to the presentence report, Javier took the opportunity to make the statement quoted above. The court then told Javier that "[w]e will get to that." Minutes later, the district court specifically asked Javier if he wanted to say anything before the sentence was pronounced. Javier replied, "No." Therefore, Javier's claim that he was denied his right of allocution has no basis in fact. Javier was free to express remorse and accept responsibility for his criminal con-

duct, but he chose not to do so. Thus, we will not now declare that he should have been given a downward adjustment under § 3E1.1.

### E. Role–in–the–Offense Adjustments

 Each defendant also claims that he should have been given a role-in-the-offense reduction because his role was equivalent to that of a "minimal" or "minor" participant. Guideline Section 3B1.2 provides a four-level reduction for minimal participants (those "plainly among the least culpable of those involved in the conduct of a group") and a two-level reduction for minor participants (those "less culpable than most other participants, but whose role could not be described as minimal"). *See* U.S.S.G. § 3B1.2, Application Notes 1, 3. We will reverse the district court's finding that a defendant is not a minimal or minor participant only if it is clearly erroneous. *See United States v. Gonzalez–Soberal,* 109 F.3d 64, 73 (1st Cir.1997) (citing *Paz Uribe,* 891 F.2d at 399).

Defendants claim that they: (1) lacked knowledge of the scope and structure of the offense; (2) performed only unsophisticated tasks; (3) did not make any decisions that were material to the offense; and (4) possessed little, if any, supervisory responsibility. In making these arguments, defendants make the same mistake they accuse they district court of making. Defendants were not convicted of conspiracy offenses; they were convicted of possession with intent to distribute cocaine while on the high seas in violation of 46 U.S.C.App. § 1903(a), (b)(1) and (f). Thus, it matters little to this analysis whether defendants knew the structure of or substantially participated in an alleged overall drug conspiracy. The fact that defendants may or may not have been a smaller part of a larger conspiracy does not diminish their role in the cocaine possession offense charged here. Defendants were the only

---

5. For the moment, we set aside the fact that Javier disputes his factual guilt in the same appellate brief in which he makes this argument that he expressed remorse and accepted responsibility for his criminal conduct.

three individuals aboard the vessel that carried the cocaine, and, as the district court found, there was little or no evidence that one of the defendants was comparatively less culpable than the other two. Defendants' showing is insufficient to demonstrate clear error in the district court's decision. *See United States v. Coneo–Guerrero*, 148 F.3d 44, 50 (1st Cir.1998) (rejecting the defendants' arguments that they, as mere transporters of cocaine, were less responsible for importing and possessing cocaine with intent to distribute than other, unnamed participants with allegedly greater responsibilities), *cert. denied*, —— U.S. ——, 119 S.Ct. 1511, 143 L.Ed.2d 663 (1999).

## CONCLUSION

Based on the foregoing, we **affirm** the judgment of the district court.